THE STATE OF IOWA, Appellee, v. RAFFELA GABRIELLA,
.Appellant.

Criminal law:    MURDER:   EVIDENCE.   On this prosecution for murder,
   1   to which the defendant entered the plea of self-defense, the evi-
       dence is reviewed and held to support a conviction for manslaughter.

**Same:** CAUSE OF DEATH: NEGLIGENT OPERATION. As the result of a gun shot wound inflicted by defendant, deceased was removed to a hospital and an unsuccessful operation was performed with a view to saving his life, the patient dying shortly afterward. There was no showing that deceased had recovered from the wound prior to the operation, or that the operation was not with good intent and for the good faith purpose of saving his life. *Held,* that the defense that death resulted from the surgical operation negligently performed was not available.

**Same:** EVIDENCE: SELF-DEFENSE: PREVIOUS QUARRELS: DISCRETION. On a prosecution for murder evidence of previous quarrels and assaults between the parties, offered in support of defendant's plea of self-defense, should be confined to the general nature of the quarrel and immediate occasion and general nature and extent of the assault. All mere details should be excluded. In passing upon the materiality of evidence of this character the court is permitted to exercise discretion. In the instant case the rejected evidence was fairly within the discretion of the court; especially in view of the fact that defendant persisted in injecting improper details into the evidence.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

SATURDAY, NOVEMBER 22, 1913.

THE defendant, having been indicted for murder in the first degree, was convicted of manslaughter, and he appeals.— *Affirmed.*

*C. O. Holly, Hubert Utterback,* and *R. E. Farrand,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General for the State.

EVANS, J.—The defendant is an Italian laborer. He has been in this country for seven or eight years. He was twenty-three years of age at the time of the commission of the alleged murder. On November 5, 1911, he shot one Nove Turso, a fel-

low countryman. Turso died, as the result of the gunshot wound inflicted by the defendant, on December 17th following. The shooting and the death are undisputed. The contention on behalf of defendant is: (1) That the death of Turso was not the result of the gunshot wound, or rather it was the result of an unnecessary surgical operation at the hospital, and (2) that the shooting was done in justifiable self-defense. In thirty-six assignments of error, three questions are presented for our consideration.

I. Does the conviction of the defendant have sufficient support in the evidence? We quote from the record the following testimony on behalf of the state:

Dante Romeo testified for the state:

I am a tailor residing at 1305 Jackson avenue, Des Moines, Iowa, working for the Des Moines Dress Club. I know Ralph Pelligrino and know that he lives on Southwest Fifth street. I was at his house on November 5, 1911, attending the christening of his baby. Ralph Pelligrino is a cousin of mine. I saw Nove Turso there. I went there about noon. I did not see defendant in the house and do not know whether he came in the house or not. I heard a window break and ran outside to see what was the matter. I heard a bunch talking and asked what was the matter and nobody answered. I heard Rudolph Luccio outside. I asked him what was the matter and he did not answer. I heard two shots and afterwards saw the defendant with a gun in his hand. I asked him to put the gun in his pocket, which he did, and then the defendant started to talk to me. At this time Nove Turso ran up and grabbed defendant and defendant said, 'Let me alone.' Turso did not want to let him alone and defendant took the gun and shot. Defendant shot Turso on the eye. They were on the west side of Fifth street. When the defendant shot, Turso had grabbed defendant on the back of the neck. Defendant had the gun in his right hand and shot back over his shoulder. After he shot, Turso and the defendant both dropped to the ground. Then other fellows came in and took the gun away from defendant and defendant ran away. I was talking to defendant when Turso came up. There were other people in

1. CRIMINAL LAW: murder: evidence.

the street. This all happened on November 5, 1911, in Des Moines, Polk county, Iowa, on Southwest Fifth street. (Cross examination:) I was at Pelligrino's home to this christening. There were a lot of other people there. They were having a good time. Everybody was drinking and was happy and dancing. I was drinking some but not so much. I did not see the defendant until after the trouble started. The first I knew was when I heard the noise. Then I went outside. There was a crowd outside. About as much of a crowd outside as in the house. After that the defendant shot twice. He shot at some fellow running in the street. I don't know who it was. I do not know what had been going on before I got there. Defendant was on the west sidewalk near the telephone pole across the street from Pelligrino's home when he did the shooting. The crowd came from the house and some of them were in the street. They gathered in the middle of the street. Other people stopped who were passing on the street. I believe there were some windows broken. When the first shot was fired I was on the east side of the street in front of Pelligrino's house. The defendant shot in the direction of a man running on the street. I could not tell where Turso was at that time. Afterwards he ran up and grabbed defendant from the back, at which time defendant was talking to me. I did not see Turso have anything in his hand. Turso had his coat off and was in his shirt sleeves. I do not know what size the revolver was that defendant had. When defendant shot, Turso fell. A fellow grabbed the defendant and said, 'Give me that gun.' Defendant left the gun with this fellow and then ran away.

Dominick Celivero testified:

I live at 611 Southwest Sixth street, Des Moines, Iowa. Have been in this country five years. I knew Nove Turso in the old country. He was a shovel hand at Valley Junction and came to this country last March, 1911. I know the defendant. I was at Raffella Pelligrino's home on November 5, 1911, at the christening. I saw Nove Turso there. He came about 10 o'clock in the morning. I saw the defendant there about 4 o'clock in the afternoon. The defendant came in and went upstairs and talked to some of his friends. When he came down he knocked over a bucket of beer. I do not

know whether he did it on purpose or how it occurred. Tony Morasco and the defendant began talking in American and the defendant asked Morasco to go outside. I heard Gabriella say 'none of his business.' I went out with Morasco. Defendant and Morasco were talking to one another as they went out. They were talking in American and I did not understand them. I saw them fight. Tony struck at defendant and defendant tried to draw a gun. I stopped him from drawing the gun. Gabriella went on out on the west sidewalk and the crowd followed him. Defendant shot three times at Sam Morasco, who was running toward me. Then Nove Turso came out. He was drunk. I did not see what defendant and Turso did. There was a crowd there. I heard a shot fired. After that defendant took off his coat and Sam Abruzzi took his revolver and he ran away. Turso was in his shirt sleeves and drunk. (Cross examination:) I have been in this country five years and in Des Moines two years. I know the defendant. He came to the Pelligrino house during the afternoon, probably about 4 o'clock. Saw Tony Morasco strike the defendant one lick about the breast when they were on the porch. Morasco, defendant, and myself only were there. They were quarreling. Defendant then went out on the sidewalk. I saw the defendant in the house but did not see him drink any there. The rest of the people were drinking but I did not see defendant drink anything there. Some of them were drunk. Some of them went out on the street and I heard them quarreling and hollowing. I did not see the defendant shoot Turso. Turso was 'drunk for sure.' He could not hardly stand up. The crowd was out in the street. Defendant had gone to the west sidewalk near the telephone pole. The Pelligrinos are related to me.

The defendant was a witness in his own behalf. We quote from the record his following testimony as a witness:

I am the defendant in this case. I live at 1926 St. Joe avenue, in the north part of the city of Des Moines. I am married, live in Des Moines, and have a family of my own. Have lived in Des Moines since 1907. Before that I lived in New York and Pennsylvania. I was born in Italy and came. to America in 1905, landed at Brooklyn, N. Y., and afterwards went to Wilkesbarre, Pa. I am twenty-three years

old. When I first came to Des Moines I worked for the street car company for three months. When I quit I went to work for the Shackelford Brick Company and have worked for them ever since, for five years. On Saturday night, November 4, 1911, I stayed at my home as usual with my family. I got up at 4 o'clock on Sunday a. m., November 5th, and went to work at Shackelford Brick Company and worked from 4 o'clock until ten that morning, when I came home, had my breakfast and dinner together. After dressing up I took the street car known as the Twelfth & Thirteenth street car at the far end of the line near where I live and came down town. I got off the car at Seventh and Grand. From there I went south to Seventh and Mulberry. I then went to Bounanni's candy store on Mulberry and bought some candy and then took a Ft. Des Moines car for South Des Moines. Got off the car two blocks south of the covered bridge. I was going to have my baby christened the next Sunday and went to see the Godfather and Godmother of the baby. After seeing them I went up to Fifth street, and went across the river bridge then up the railroad track to Sixth and Elm to Rudolph Luccio's house. I went to see Rudolph Luccio, Frank Severino, John Scaglino, Sam Abruzzes, and Dominick Abruzzes, friends of mine, to invite them to my christening. I found Mrs. Luccio and her little girl at home. Mr. Luccio was over at the Pelligrino home about a block away on Fifth street. I waited until Rudolph came home. After that Rudolph Luccio took me over to the Pelligrino home to see Frank Severino to invite him to my baby's christening on the 12th of November. We went in the house and Luccio told me that the parties I desired to see were upstairs. We then went upstairs and I found the friends I wanted to invite to my christening. When I went in the house, I saw a lot of people drinking, dancing, and hollowing. There were five rooms all full. After inviting my friends that I went to see I started to go home and coming down the stairway, which is kind of crooked and has a turn in it and a door at the bottom and was dark, I tipped something over. I am not sure what it was. This was about three steps from the bottom of the stairs. When I got downstairs I started to the door to go home. When I had opened the door and had one foot outside, Tony Morasco came up and grabbed the door and grabbed me by the collar of the coat

and said, 'Don't you know who I am?' and I said: 'Yes, sir. Tony Morasco is all; I know so far.' Then I started to get away and he hit me. Sam Marasco, his brother, then came out and he hit me on the back of the head several times. I do not know how many. Somebody also kicked me on the leg. I have the mark here yet. I tried to get away off the porch and a pile of people came down and grabbed me and punched and pounded me. About this time Sam Abruzzi grabbed me and pushed me out of the gate. The Pelligrino house is below the level of the street. The street has been filled. The Pelligrino house is on the east side of Fifth street. After I got out of the gate I ran across to the west side of the street to the telephone pole. I was about all in. I turned around to see what they were doing. I saw Sam Morasco, Tony Morasco, and Rafella Morasco, all brothers, coming down upon me. They were one on one side of the street, one on the other side, and one in the middle. They balled me up and I could not get away. At this time I was by the telephone pole. The three Morasco brothers were running at me. I turned around with my back to the telephone pole and pulled my revolver and shot twice in the air. I shot up, thought I would make them scared. I shot in the air to scare the people to see if I could not get away. They seemed to pay no attention and when I got about six feet away from the telephone pole somebody knocked me twice on top of the head and grabbed me and choked me. I never knew who it was. There was more than one person hold of me. I told them three times: 'Let me loose! Let me loose! Let me loose!' Some one said: 'No, you cannot get away any more. I have you in my hands.' I know of nothing else that was said. Some one had hold of my left hand. I got my right hand loose and grabbed my gun and shot backward over my right shoulder in the air. The whole bunch fell down after I shot. I fell down too, and we all rolled down the bank on the west side of the street. Some one tried to hold me and kept hitting me. I do not know who it was. I had on my overcoat up to this time but managed to slip out of it and got away. I do not know how the man was dressed that was choking me. I never saw him and do not know who it was, except that I was afterwards told it was Nove Turso. I understand that Nove Turso was a brother-in-law of the three Morasco brothers. I saw Nove Turso once before down at

Sam Abruzzi's grocery store and never had any trouble with him.

The foregoing quotations are sufficient answer to appellant's contention at this point. They leave no room for debate, and we will not discuss them.

II. Did the death of Turso result from the gunshot wound? It is contended for the appellant that the death of Turso resulted from a surgical operation which was negligently performed. Counsel for appellant sought to make an issue upon such question upon the trial. Immediately after the shooting Turso was taken to the hospital where he was cared for up to the time of his death. Because of his condition as the result of the wound, the hospital physicians performed an operation upon him with a view of improving his condition and saving his life. The operation, however, was not successful, and the patient died within a few hours. At the trial the defendant offered testimony "to show that the operation was not performed in a manner that a reasonably prudent doctor would perform the same." All proffered testimony along this line was rejected by the trial court. There is no claim that Turso had recovered from his wound at the time of the operation, nor that there was any evil intent in the performance of the operation, nor that it was performed for any other purpose than in a good-faith attempt to save the life of the patient. Lack of skill or bad judgment or mere negligence in any form on the part of the surgeon will not avail the slayer to protect him against the final consequences of his wrongful act.

III. Was the defendant improperly restricted in the introduction of testimony to sustain his claim of self-defense. At this point three brothers, the Morascos, fellow countrymen of the defendant, figure in the evidence. Prior to the shooting of Turso, the defendant had had brief encounters with two of the Morascos in succession. Following these encounters there

*2. SAME: cause of death: negligent operation.*

*3. SAME: evidence: self-defense: previous quarrels: discretion.*

was some degree of pursuit of the defendant on the part of several persons. He was attacked by Turso from behind. He claimed that he was first struck on the head and then firmly gripped. He did not know who his assailant was but supposed it was one of the Morascos. Turso was in fact a brother-in-law of the Morascos. The defendant was permitted to show that there had been long-standing hostility toward him on the part of the Morascos; that four or five years previously one of them had made a deadly assault upon him with an iron bar and had struck him therewith; that about two years previous to the trial two of the Morascos had assaulted him with drawn knives. Concerning these previous assaults, many details were offered in evidence bearing upon the merits of the quarrel. These were ruled out by the trial court, and complaint is made of such rulings. Such rulings were in accord with the well-settled rules in such cases. The general nature of the quarrel and the immediate occasion for the assault and the general nature and extent of the assault comprises all that is usually material where such assault is not related in its circumstances to the particular quarrel or assault in which the shooting occurred. The purpose of such testimony is only to show reasonable grounds of apprehension on the part of the defendant as to the safety of his person. For such purpose the salient facts are quite sufficient, and mere details furnish no additional aid in that direction.

The serious question in this record at this point is as to whether the trial court unduly limited the defendant in his showing as to the extent of injury inflicted upon him by the Morascos. The extent of actual injury inflicted by a previous assault may be an important consideration as bearing upon the ground of reasonable apprehension of danger on the part of the defendant in the final quarrel. The trial court drew a rather close line on the defendant at this point. We would have been better satisfied with the state of this record if the trial court had allowed a larger latitude to the defendant in his showing of the extent of the bodily injury previously

inflicted upon him by the Morascos. However, in this line of examination, a latitude of discretion must be permitted to the trial court. In this case the defendant was persistent in injecting into the testimony much improper detail, and this persistency necessitated vigilance on the part of the trial court to keep the record within bounds. As to the first assault, the defendant was permitted to show that he was struck upon the head with an iron bar and rendered unconscious, and this evidence was not disputed by the state. The defendant attempted to introduce further evidence showing the extent of his injury to the effect that he received a serious scalp wound, the scar of which he offered to exhibit. This line of evidence was refused. We think it could well have been admitted. We are satisfied, however, that the ruling of the trial court at this point was within the fair latitude of its discretion. No definite line can be laid down as to what is substance and what is mere detail in such a case. From the record as a whole we are impressed that the defendant had a fair trial and that the jury dealt tenderly with him. He left his home on Sunday morning with a view of extending an invitation to a few of his friends to attend a christening at his home on the following Sunday. On the way he bought a 38 caliber revolver. He went to the home of the Pelligrinos, where another christening was under celebration. He soon found himself in conflict. He fired his newly acquired revolver twice without mortality. He claims to have done this only to scare the people. It appears to have had that effect. In their fright they rushed in pursuit of him. Many of them were in that fine state of intoxication so essential to the proper christening of a babe. When he was gripped from behind by a drunken man, he fired over his shoulder without knowing who was his assailant or who might be the victim of his bullet. It is urged in his defense that he did not consciously shoot anybody because he did not know who was behind him. This argument might be available to reduce the degree of the crime.

The jury by the verdict reduced the crime charged to its

lowest possible degree. He was clearly guilty of manslaughter, and the judgment of conviction is *Affirmed*.

WEAVER, C. J., and LADD and PRESTON, JJ., concur.